**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

TANNER SHOLES

      Plaintiff,

v.

~~CITY COUNCIL OF~~ THE CITY OF CRAIG COLORADO, a municipality;
~~BOARD OF COUNTY COMMISSIONERS FOR MOFFAT COUNTY COLORADO, a municipality~~;
<u>MOFFAT COUNTY SHERIFF'S OFFICE</u>;
CHIP MCINTYRE, an individual;
KURTIS LUSTER, an individual;
NATE BUSINGER, an individual;
BRANDON MONTOYA, an individual;
MATT HAMMER, an individual;
DALTON CAUDELL, an individual;
TRACEY MENDOZA, an individual;
~~GRANT LAEHR, an individual;~~

      Defendants.

---

**CIVIL RIGHTS COMPLAINT AND JURY DEMAND**

---

      Plaintiff, Tanner Sholes, by and through his attorneys, Kishinevsky & Raykin, hereby

brings this Complaint and Jury Demand against Chip McIntyre, Kurtis Luster, Nate Businger,

Brandon Montoya, Matt Hammer, Dalton Caudell, Tracey Mendoza, ~~Grant Laehr,~~ the ~~City~~

~~Council of the~~ City of Craig Colorado, and the ~~Board of Commissioners for Moffat County~~

~~Colorado,~~ Moffat County Sheriff's Office, (each a "Defendant" and, together, the "Defendants"),

and alleges the following:

      **I.**      <u>**INTRODUCTION**</u>

On September 22, 2023, Tanner Sholes ("Mr. Sholes") was run over by a car driven by Lieutenant Nate Businger ("Businger") of the Moffat County Sheriff's Office ("MCSO") as part of a coordinated law enforcement operation conducted by multiple officers of the MCSO and Craig Police Department ("CPD"). The decision to run Mr. Sholes over was personally overseen by Moffat County Undersheriff Chip McIntyre. Mr. Sholes suffered severe injuries throughout his body including a torn ACL, torn meniscus, torn rotator cuff, and torn bicep, among multiple smaller tears and other less severe injuries. He also suffered extensive psychological injuries and continues to do so.  Mr. Sholes miraculously did not sustain life-threatening injuries. Nevertheless, Mr. Sholes endured months of pain and trauma and required frequent and ongoing treatment including invasive surgery.

When Businger ran his car into Mr. Sholes, it was the final act in an hours-long combined law enforcement operation to surveil and ultimately subdue Mr. Sholes with deadly force. The operation began when the Craig Regional Dispatch Center ("dispatch") received a 911 call at approximately 7:00 a.m. reporting a male party walking through the City of Craig with a rifle. Importantly, the caller did not report the man for any kind of threat or other criminal conduct. Rather, the caller's concern was based entirely on the appearance of a rifle barrel poking out from beneath the male party's shirt. The caller sought to notify the police, nothing more. In response to the 911 call, the CPD dispatched several officers to surveil the male party.

A short time after 7:00 a.m., dispatch received a second, independent, 911 call also notifying the police of a male party carrying a rifle. Like the first caller, the second caller informed the police of their concerns regarding the rifle, but otherwise explicitly stated that the man was doing nothing wrong.

Officer Tracy Mendoza ("Mendoza") of the CPD responded to the calls and located a man walking through Craig with what appeared to be a rifle slung on his back. The rifle was partially obscured beneath the man's shirt and backpack; however, Mendoza was able to identify a rifle barrel poking out from beneath the man's clothes. Mendoza also identified the man as Mr. Sholes based on prior contact.

Upon identifying Mr. Sholes, Mendoza continued to surveil him as he travelled through Craig. Other officers similarly responded at various times and surveilled Mr. Sholes as he walked through the town. Throughout Mr. Sholes' time in Craig, the officers did not observe him make any threatening gestures or otherwise commit a criminal offense. The only offense the officers suspected Mr. Sholes of at that time was the violation of a protection order based on Mr. Sholes apparent possession of a firearm.

Upon identifying Mr. Sholes, officers called upon Mr. Sholes' former paramour and mother to see if either was aware of any concerns regarding Mr. Sholes or of his possession of a firearm. Mr. Sholes' former partner stated she had no knowledge of why Mr. Sholes was walking through Craig and that she did not own any firearms. Mr. Sholes' mother, Barbara

Sholes ("Ms. Sholes") reported no knowledge of why Mr. Sholes was walking through Craig and reported that none of her firearms was missing. Ms. Sholes did report that she was unable to locate a BB gun she owned and showed the officer a similar lever-action air rifle to the one she was missing.

During this time, officers continued to surveil Mr. Sholes as he walked through, and out of, Craig. Once Mr. Sholes left Craig, he continued north along Highway 13. At this time, Undersheriff McIntyre activated the Special Response Team ("SRT") and called in various members of the CPD and MCSO. One of these, Sergeant Matt Hammer ("Hammer"), was called out to use his department-issued drone to monitor Mr. Sholes. Throughout this time, Mr. Sholes simply continued walking.

Near the intersection of Highway 13 and County Road 208, Mr. Sholes turned off the highway onto an unmarked dirt road. Mr. Sholes continued down the road, which officers later identified as Road 208, passing several residences, and fed some horses before continuing. At this point the SRT team assembled at the intersection of Highway 13 and the dirt road and planned to contact Mr. Sholes. There, McIntyre and his fellow officers developed a plan to run Mr. Sholes down with a police SUV equipped with metal push bars. Businger was assigned to the car that hit Mr. Sholes and took several officers with him. The remainder joined McIntyre in the second vehicle.

The two vehicles pursued Mr. Sholes down the dirt road passed the two residences. The dirt road continued for a distance, passing a third residency, before terminating in a field. Inexplicably, the officers determined that Mr. Sholes needed to be stopped because of the potential danger he posed to the third residence. Neither Mr. Sholes nor Curtis Cook, the owner of the third residence, had any knowledge of each other nor any previous contact.

As Mr. Sholes continued walking, the officers pulled up behind him in their vehicles. McIntyre gave several commands to Mr. Sholes to drop to the ground. Mr. Sholes continued walking but held his hands in the air, clearly showing he was not bearing a weapon. McIntyre then identified the vehicles as law enforcement. Twenty seconds later, Businger rammed his vehicle into Mr. Sholes at between 20 and 30 mph.

Luckily, Mr. Sholes heard the oncoming vehicle and was able to turn most of the way around to meet the vehicle. This likely saved his life, as he was able to throw his hands up to brace himself as the vehicle struck. Had he not been able to brace himself, there is a significant likelihood that his head would have absorbed a portion of the impact. Similarly, had he not turned, the car would have struck his back, forcing his spine to bend backwards or to the side, causing potentially life-threatening injuries. Despite Mr. Sholes' last-second efforts to save his life, he was nevertheless severely injured.

Immediately after the strike, Mr. Sholes began screaming in pain, telling officers that his left knee had been injured. At the time, Mr. Sholes did not know the extent of his injuries, but

he was unable to bend his left leg or walk. Until an ambulance arrived, Mr. Sholes was handcuffed and left lying in a ditch to the side of the road.

After Businger struck Mr. Sholes with his car, the assembled officers jumped from their vehicles, restrained Mr. Sholes with handcuffs and seized his property. Several of the officers inspected the rifle and determined it was a BB gun rather than a firearm.

When the ambulance finally arrived, Mr. Sholes was transported to Memorial Regional Hospital, in Craig, CO. There, he was sedated by doctors and examined. Incredibly, the hospital staff failed to examine Mr. Sholes' left leg. Instead, they imaged his right knee and determined that he had suffered no significant injuries. In fact, Mr. Sholes suffered multiple severe injuries to his left arm and leg that were undiagnosed, unexamined, and untreated by the staff at Memorial Regional Hospital.

When Mr. Sholes was revived to be transported to the Moffat County Jail, he told both the officers and hospital staff present that he was in pain from his left leg and unable to walk. The hospital staff then informed the officers that they had not examined Mr. Sholes' left leg. Despite this and the fact that the officers were on the scene of the strike and observed Mr. Sholes' crying out from pain in his left leg as he lay, unable to move, in a ditch, the officers transported Mr. Sholes' to jail without an examination of his actual injuries.

At the jail, Mr. Sholes was left similarly unexamined and untreated. It was not until a month later, after Mr. Sholes had been released, that he was able to obtain a private medical

examination, which determined both his left leg and arm sustained serious injuries from the strike. Since then, Mr. Sholes has continued to experience severe pain and loss of utility in both his left arm and leg. Mr. Sholes' injuries have also required surgical intervention, further exacerbating his pain and limiting the use of his limbs.

The officers conduct in running Mr. Sholes over with a car, from behind, while he held his hands in the air and posed no threat to officers or any others was clearly unreasonable.

## II.     JURISDICTION, VENUE, AND PARTIES

1. This action arises under the Constitution and laws of the United States, including 42 U.S.C. §§ 1983, 1988, and the laws of the state of Colorado, including Colo. Const. art. VI, § 9(1), and C.R.S. § 13-1-124.

2. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331 and 1343 relative to the federal claims. Jurisdiction for the supplemental state law claims is conferred upon this Court by 27 U.S.C. § 1367.

3. Venue is proper within the District of Colorado pursuant to 28 U.S.C. § 1392(b) because all of the events giving rise to the claims in this matter occurred within the District of Colorado.

4. Plaintiff timely and properly submitted a Notice of Claims in connection with the state law claims stated in this matter and has properly exhausted all administrative remedies.

## III.     PARTIES

5.  At all times relevant to this action, Plaintiff Tanner Sholes was an adult resident of the State of Colorado and a citizen of the United States.

6.  At all times relevant to this action, Defendants Chip McIntyre, Nate Businger, Kurtis Luster, Matt Hammer, Brandon Montoya, and Dave Siminoe, were citizens of the United States and residents of the state of Colorado and acted under color of state law in their official capacity as law enforcement officers with the Moffat County Sheriff's Office.

7.  At all times relevant to this action Doug Conrad, Dalton Caudell, Grant Laehr, and Tracy Mendoza were citizens of the United States and residents of the state of Colorado and acted under color of state law in their official capacity as law enforcement officers with the Craig Police Department.

8.  The Moffat County Sherriff's Office ~~is a municipality in the State of Colorado and~~ is a "person" subject to suit under 42 U.S.C. § 1983.

9.  The Moffat County Sheriff's Office is a department of Moffat County. At all times relevant to this matter, officers and personnel of the Moffat County Sheriff's ~~Department~~Office acted as agents of Moffat County under color of state law.

10. At all times, Defendant Moffat County Sheriff's Office ("MCSO") was responsible for the oversight, supervision, discipline, and training of Moffat County Sheriff's Office personnel including Defendants McIntyre, Businger, Luster, Hammer, Montoya, Siminoe.

11. The City of Craig is a municipality in the State of Colorado and is "person" subject to suit under 42 U.S.C. § 1983.

12. The Craig Police Department is a department of the City of Craig. At all times relevant to this matter, officers and personnel of the Craig Police Department acted as agents of the City of Craig under color of state law.

13. At all times, Defendant City of Craig was responsible for the oversight, supervision, discipline, and training of Craig Police Department personnel including Doug Conrad, Dalton Caudell, Grant Laehr, and Tracy Mendoza.

## IV.    FACTUAL ALLEGATIONS

14. The Plaintiff, Tanner Sholes ("Plaintiff" or "Mr. Sholes") is a resident of the State of Colorado and a citizen of the United States entitled to the full protection and guarantees of its laws.

15. On or about September 22, 2023, between the approximate hours of 8:30 and 9:00 a.m., Lieutenant Nate Businger ("Businger") ran Mr. Sholes over with his department-issued vehicle, equipped with metal push bars.

16. The contact between Businger and Mr. Sholes arose after officers from both the Craig Police Department ("CPD") and Moffat County Sheriff's Office ("MCSO") were activated as members of a Special Response Team ("SRT") by Undersheriff Chip McIntyre ("McIntyre").

17. Based on the totality of the circumstances, the SRT's decision to run Mr. Sholes over was objectively unreasonable. *See Arnold v. City of Olathe*, 35 F.4th 778, 788 (10th Cir. 2022) (providing the elements of the objective reasonableness standard); *see also Womack v. Rodriguez*, No. 2:20-cv-02638-HLT, 2023 U.S. Dist. LEXIS 25958, at *16 (D. Kan. Feb. 15, 2023) (applying the objective reasonableness standard to "striking [a] plaintiff with [a] police vehicle, without warning, while [the] plaintiff fled officers on foot . . .").

**The 911 Calls**

18. On or about September 22, 2023, at approximately 7:05 a.m., officers of the CPD received a 911 call from Michelle Tucker notifying the police of a male party seen carrying a rifle on foot through the City of Craig.

19. CPD received a second call a short while later also notifying the police of a male party carrying a rifle.

20. Both callers sought to notify the police of the presence of the rifle but otherwise did not communicate any wrongdoing by the male party. The second caller explicitly stated that the male party had done nothing wrong.

21. CPD dispatched several officers to locate the man. At approximately 7:11, CPD Officer Tracey Mendoza ("Mendoza") responded and identified the man as Mr. Sholes. Mendoza also observed the barrel of a rifle poking out from beneath Mr. Sholes' outer shirt.

## The Coordinated Surveillance Operation

22. Over the course of the next hour, officers from both the CPD and the MCSO continued to surveil Mr. Sholes as he travelled north through Craig and eventually into Moffat County, which is an open carry county in Colorado. The officers involved include the following:

    a. From the MCSO: Undersheriff McIntyre, Lieutenant Businger, Sergeant Matt Hammer, Investigator Dave Siminoe, and Sergeant Kurtis Luster.

    b. From the CPD, Mendoza and Commander Doug Conrad.

23. During the surveillance of Mr. Sholes, Mendoza briefly visited the home of Michelle Workman, Mr. Sholes' former paramour. Mendoza spoke with Ms. Workman, who confirmed she had no knowledge of Mr. Sholes' journey or possible possession of a firearm on the morning of September 22, 2023. Ms. Workman also confirmed that she did not own any firearms that Mr. Sholes' could have taken.

24. At approximately the same time, McIntyre dispatched Investigator Gary Nichols ("Nichols") of the MCSO to contact Mr. Sholes' mother, Barbara Sholes ("Ms. Sholes"). Ms. Sholes denied any knowledge of Mr. Sholes' movements or plans on the morning of September 22, 2023. Ms. Sholes also denied that any firearms were missing from her home. Ms. Sholes did inform Nichols that she was unable to locate a BB gun in her possession.

25. During this time, Mr. Sholes' left the City of Craig and entered Moffat County, travelling north along Highway 13. At approximately the same time, dispatch informed the officers that Mr. Sholes was restrained pursuant to three protection orders that barred him from possessing a firearm. Around the same time, several officers reportedly claimed Mr. Sholes obstructed traffic along Highway 13.

26. McIntyre and Commander Doug Conrad both allegedly observed Mr. Sholes obstruct traffic as they passed him in their vehicles. Sergeant Matt Hammer ("Hammer") also allegedly observed Mr. Sholes impeding traffic from his drone, which he had been using to surveil Mr. Sholes' progress.

27. To Mr. Sholes' knowledge, no body worn camera, dash camera, or drone camera footage exists to corroborate these allegations.

28. Based on the foregoing, at approximately 8:15 a.m., McIntyre decided to close Highway 13 to the public around the area of Mr. Sholes. Meanwhile, Mr. Sholes continued to walk north on Highway 13.

29. Shortly before 8:30, Mr. Sholes turned off Highway 13 onto an adjacent unmarked road, later erroneously identified as County Road 208.[1]

---

[1] According to publicly available mapping, Moffat County Road 208 is approximately 1,000 feet north of the unmarked road Mr. Sholes turned down. However, Curtis Cook, the owner of a residence along the dirt road later identified his address as on Road 208 and clarified that the identification of Road 208 was improper. It is unclear at this time which of these roads is actually Road 208 and which is unmarked.

30. Importantly, prior to Mr. Sholes leaving Highway 13, the SRT officers had not sought to contact Mr. Sholes or otherwise impeded his progress north. The officers only sought to contact Mr. Sholes once he turned off Highway 13.

31. By turning off Highway 13, Mr. Sholes dispelled any possible concerns regarding impeding a highway. Other than the officers, there were no vehicles on the road for Mr. Sholes to impede.

32. Accordingly, once Mr. Sholes turned off Highway 13, Mr. Sholes' only suspected criminal violation was the possible possession of a weapon while restrained, a misdemeanor level offense.

**Ranney Street to County Road 208**

33. When dispatch received the initial 911 call, Mr. Sholes was travelling north along Ranney Street in the City of Craig.

34. He continued north along Ranney until it connected with North Yampa and Yampa Avenue.

35. Estimating conservatively, Mr. Sholes travelled approximately one- and one-half miles through the City of Craig on the morning of September 22, 2023.

36. During that time Mr. Sholes passed at least 49 individual residences.

37. Mr. Sholes did not threaten any of the occupants of the 49 residences.

38. Mr. Sholes did not attempt to enter any of the 49 residences.

39. To leave Craig, Mr. Sholes walked north along Yampa Ave. until it transitioned into Highway 13.

40. The distance from Yampa Ave. to County Road 208 is approximately three miles. During that time, Mr. Sholes passed an additional 20 residences, estimating conservatively.

41. In total, before turning on the dirt road, Mr. Sholes walked past 70 private residences immediately adjacent to his path. Including additional residences that did not directly abut Mr. Sholes' path brings the total into the hundreds.

42. Mr. Sholes walked past each of these homes without incident or any threat of harm.

43. Law enforcement did not attempt to contact Mr. Sholes at any time throughout this journey.

**County Road 208**

44. The officers only decided to contact Mr. Sholes after he turned off Highway 13, allegedly based on their concern for the private residence at the end of the road.

45. The private residence near the end of the road is owned by Curtis Cook ("Mr. Cook").

46. There are no markings to suggest that the road Mr. Sholes turned on was anything other than a public road. In fact, an adjacent sign marked the road as County Road 208.[2]

47. Mr. Sholes walked down the road believing it to be a public road. He did not stop at any of the residences along the way, nor did he have any knowledge of Mr. Cook at that time.

---

[2] *See supra* at N.1

48. Mr. Sholes also did not threaten or otherwise jeopardize the safety or wellbeing of any of

the residents along the dirt road.

49. While Mr. Cook's residence is the final home along the dirt road, there are at least two

other private homes that share the road:



50. The distance between Highway 13 and the approximately location where the officers ran

over Mr. Sholes is also about 2,000 feet.

51. Including the additional residences along the dirt road, over the course of an hour and a half, Mr. Sholes passed 72 private homes before approaching Mr. Cook's home.

52. Despite the significant number of private residences Mr. Sholes passed, the officers never attempted to contact him before he approached Mr. Cook. The officers did not provide any explanation for why they were concerned for Mr. Cook but not for the other homeowners.

**Running Over Mr. Sholes**

53. At approximately 8:30, the assembled SRT gathered at the intersection of Highway 13 and the unmarked dirt road.

54. The assembled team included MCSO officers McIntyre, Businger, Hammer, Luster, and Deputy Brandon Montoya ("Montoya"). Officers from the CPD included Mendoza and Sergeant Dalton Caudell ("Caudell").

55. During the conference at the intersection, McIntyre notified the assembled officers of a plan to contact Mr. Sholes. Accordingly, McIntyre instructed the officers to gather into two vehicles to pursue Mr. Sholes, one driven by Businger and the other driven by himself.

56. The plan was for McIntyre to issue verbal commands to Mr. Sholes using his vehicle's loudspeaker while Businger drove behind Mr. Sholes in the second vehicle. Depending

on Mr. Sholes' compliance, Businger would then drive his vehicle into Mr. Sholes to disable him so the officers could seize him and the alleged firearm he was carrying.

57. The officers' decision to run Mr. Sholes over was based on three factors allegedly known at the time:

   a. Mr. Sholes' criminal history, including previous incidents where he resisted arrest and/or bore other weapons;

   b. Mr. Sholes' unknown mental state; and

   c. Mr. Sholes' later failure to comply with McIntyre's commands.

58. The officers' decision was also based on the hypothetical chance that Mr. Sholes could force the officers into an altercation where they could be required to use deadly force.

59. The officers also considered prior statements made by Ms. Workman at an indeterminate time that suggested Mr. Sholes may attempt suicide-by-cop.

60. Considering these factors, the officers decided that the best option was for Businger to run Mr. Sholes over with his car.

61. At the time of the conference, Mr. Sholes had not removed the alleged rifle from its sling along his back, nor had ne made any kind of threat or threatening gesture to the officers or any others.

62. The most severe allegation against Mr. Sholes at that point was that he had impeded

   traffic on Highway 13 and was possibly in violation of a protection order, both

   nonviolent misdemeanor-level offenses.

63. Furthermore, during the officers' conference, they did not consider any non-lethal kinds

   of force.

64. The officers were equipped with, or had access to, a variety of non-lethal tools, including

   tasers and less-than-lethal ammunition such as bean bag rounds. None of these were

   considered.

65. The officers also did not consider contacting Mr. Cook directly to warn him of Mr.

   Sholes' approach. The officers had previously conducted a reverse 911 when they closed

   Highway 13, showing that they had the capacity to advise Mr. Cook to shelter-in-place

   until Mr. Sholes had past his home.

66. Finally, the officers also did not attempt any non-violent methods to protect Mr. Cook.

   The officers did not attempt to pass Mr. Sholes on the dirt road to warn Mr. Cook or to

   block Mr. Sholes' path, despite the fact that Mr. Sholes was on foot and the officers were

   in multiple vehicles.

67. Rather than any of these options, the officers decided the best course of action was to

   pursue Mr. Sholes and give verbal commands via loudspeaker, and, if he failed to

   comply, run him over with a car.

**Threats to Officers or Others Safety**

68. Throughout the entire encounter, Mr. Sholes did not threaten anyone.

69. Despite the officers' concerns surrounding the alleged rifle, by the time the officers decided to strike Mr. Sholes with a car, he had passed 70 private residences and was currently passing two more.

70. Moreover, despite over one and a half hours of surveillance, Mr. Sholes had not threatened the officers or any other person.

71. At the time the officers decided to run him over, Mr. Sholes was suspected of a protection order violation and impeding a highway.

72. When the officers actually decided to contact Mr. Sholes, he had left Highway 13 and could no longer impede traffic.

73. Accordingly, when the officers approached Mr. Sholes from behind, the only offense he was actually suspected of at that time was the protection order violation.

74. The suspected violation was a strict liability standard based on whether Mr. Sholes was, in fact, carrying a weapon. It did not account for, or otherwise consider, Mr. Sholes' mental state or his surrounding conduct.

75. Thus, when the officers pulled in behind Mr. Sholes, their fears were entirely hypothetical based on what Mr. Sholes *could* do if he chose to use the suspected rifle violently.

76. For example, several of the officers, including McIntyre, Businger, and Montoya, explicitly noted that they decided to run Mr. Sholes over to avoid the possibility that they could be drawn into an armed standoff.

77. As such, the officers' decisions were based on what *could* happen rather than what *actually* happened.

### Running Mr. Sholes Over

78. As noted, while the officers discussed the plan, Mr. Sholes continued down the dirt road, passing at least two residences without incident.

79. Over the course of approximately four minutes, the officers gathered in their cars and followed Mr. Sholes down the road.

80. As they approached, McIntyre issued a command ordering Mr. Sholes to drop to the ground.

81. At first, Mr. Sholes did not respond to the command. In response, McIntyre repeated the order a few times over approximately fifteen seconds.

82. McIntyre then identified the officers as members of the sheriff's office.

83. In response, Mr. Sholes continued walking, but held his arms in the air, showing that his hands were empty.

84. Approximately twenty seconds later, Businger accelerated towards Mr. Sholes.

85. Businger's vehicle was an SUV equipped with large metal push bars.

86. Businger accelerated to a speed between 20 and 30 mph.

87. As Businger approached, Mr. Sholes turned and saw the vehicle and spun around to protect himself from the impact.

88. Mr. Sholes' last-second reaction allowed him to protect himself with his hands as the vehicle struck. Nevertheless, Mr. Sholes was thrown into the air and tossed into a nearby ditch.

89. Nearly as soon as Mr. Sholes landed, officer from both cars seized and restrained him.

90. The officers seized his property including the alleged rifle.

91. Upon inspection, the officers determined that the rifle was, in fact, a BB gun.

**Mr. Sholes' Injuries and their Aftermath**

92. Upon later examination, Mr. Sholes suffered the following severe physical injuries:

    a. Complete ACL rupture;

    b. Complex tear of the lateral meniscus;

    c. Horizontal tear of the medial meniscus;

    d. Grade 1 MCL injury;

    e. Rotator cuff tendinopathy;

    f. Bicep tendinopathy with partial tear.

93. Mr. Sholes also suffered multiple smaller tears, lacerations, and abrasions.

94. Immediately upon being struck, Mr. Sholes began crying out in pain.

95. Mr. Sholes' most severe injuries were to his left knee, which he was unable to bend, and which could not bear his weight.

96. While Mr. Sholes continued to cry out in pain, the officers seized his property and conducted the inspection of the BB gun.

97. After handcuffing Mr. Sholes in the ditch, the officers contacted an ambulance.

98. The ambulance eventually arrived and immobilized Mr. Sholes. The EMTs also cut open Mr. Sholes' pants around his left knee.

99. The ambulance then transported Mr. Sholes to Memorial Regional Hospital ("Memorial").

100. Memorial failed to fully examine or properly clear Mr. Sholes for transport to the Moffat County Jail ("jail").

101. Somehow, the information that Mr. Sholes left knee had been injured, which was provided to the officers, and from the officers to the EMTs, was not provided to the hospital staff.

102. When Mr. Sholes arrived at Memorial, he was sedated, preventing him from further clarifying his injuries.

103. While Mr. Sholes was sedated, Memorial examined his *right* leg and found no severe injuries. No one at Memorial ever examined Mr. Sholes' *left* leg.

104.     After examining his right leg, Memorial cleared Mr. Sholes for transport to jail and revived him.

105.     Immediately upon being revived Mr. Sholes commented on the pain in his left leg.

106.     Mr. Sholes was also unable to walk despite having been cleared for transport.

107.     Montoya, who travelled to the hospital with Mr. Sholes, was present when Mr. Sholes was revived. When the officers attempted to transport Mr. Sholes to a police truck, Montoya observed as Mr. Sholes was unable to enter due to his inability to bend his knee.

108.     Eventually, the officers forced Mr. Sholes into the vehicle, despite his cries of pain, while Montoya spoke with some of Memorial's staff members.

109.     The staff confirmed to Montoya that they had not examined Mr. Sholes left leg. Nevertheless, the officers transported Mr. Sholes to jail, where his injuries remained untreated.

110.     Once Mr. Sholes secured his release, he was examined at Poudre Valley Hospital. There, his injuries were finally diagnosed, and he began treatment.

**The Actions and Inactions of the ~~County of~~ Moffat <u>County Sheriff's Office</u> and the City of Craig Were Causal Factors in the Underlying Constitutional Violation**

111.     The individual officers' treatment of Mr. Sholes was conducted in pursuit of city and county training, custom, policy, and practice of unlawful conduct.

112. ~~Moffat County's ("Moffat" or "County")~~ The Moffat County Sheriff's Office's ("MCSO") widespread and deliberately indifferent customs, habits, practices, and/or policies of condoning and ratifying the excessive use of force led to the officers' decision to use unreasonable and extreme force against the Mr. Sholes.

113. The City of Craig's ("Craig" or "City") widespread and deliberately indifferent customs, habits, practices, and/or policies of condoning and ratifying the excessive use of force led to the officers' decision to use unreasonable and extreme force against the Mr. Sholes.

114. ~~Moffat~~MCSO and Craig's officers' unlawful conduct, as set forth in detail herein, amounts to a custom and widespread practice so pervasive and well-established as to constitute a custom or usage with the force of law.

115. ~~Moffat~~ MCSO and Craig's unlawful customs, policies, and practices are demonstrated by its Special Response Team's ("SRT") decision to use deadly force to subdue a nonviolent suspect under the personal supervision of Undersheriff McIntyre.

116. The involvement of the SRT and high-ranking law enforcement officials such as McIntyre and CPD Commander Conrad shows that ~~Moffat~~ MCSO and Craig knew or should have known of the obvious risk of harm faced by members of the public when contacted by CPD and MCSO, yet neither the City nor County took adequate action to address such risk in the years leading up to the attack on Mr. Sholes.

117.    Given the involvement and personal approval of the second-highest ranking law enforcement official in the County, ~~Moffat~~ MCSO knew or had constructive knowledge that its officers used excessive and unnecessary force when contacting members of the community.

118.    Given the involvement of high-ranking City law enforcement officials such as Commander Conrad, Craig knew or had constructive knowledge that its officers used excessive and unnecessary force when contacting members of the community.

119.    In light of this knowledge, ~~Moffat~~ MCSCO and Craig, and their respective law enforcement agencies, could have and should have pursued reasonable methods for training and supervising law enforcement officers, including the named Defendants, in interacting with members of the public and the appropriate use of force, but they failed to do so.

120.    Regarding training and supervision, ~~Moffat~~ MCSO and Craig trained and encouraged officers to default to the use of the maximally permitted level of force rather than non-force alternatives and to use force whenever force could be legally justified, rather than limiting the use of force for when force is necessary.

121.    Regarding hiring, investigation, and discipline, ~~Moffat and Adams give virtually unbridled authority to the MCSO and CPD~~ MCSO controls its own operations, and Craig delegates this authority to the Police Deparment. Moreover, the law enforcement

agencies operate in such a way that officers who violate the law or policy regularly remain on the force.

122. Collectively, at least eight officers from the MCSO and CPD under the direct supervision of Undersheriff McIntyre failed to employ, or even consider a use of force reasonable in light of the circumstances. The coordination between the two agencies exemplified by the SRT and the personal supervision of Undersheriff McIntyre reflects a custom, policy, and/or practice of encouraging, tolerating, and/or ratifying blatantly illegal and improper conduct.

123. These encouragements, toleration of, and ratifications demonstrate that such police misconduct is carried out pursuant to the policies of and regimen of training provided by ~~Moffat~~MCSCO and Craig, that such conduct is customary within ACSO and CPD, and were the moving force behind Defendants' violation of Mr. Sholes' rights.

124. The coordination of the two agencies and the involvement of high-ranking personnel from each raises a more than plausible and compelling inference of purposeful policies, or tacit endorsement, of extreme violence by MCSO and CPD officers.

125. Further, they reflect a marked failure to develop sufficient training or practices regarding de-escalation or alternatives to the use of extreme force. Evidence of these other wrongs, as set forth herein, is legally admissible to show proof of motive,

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or

accident.

**Moffat County <u>Sheriff's Office</u> and the City of Craig's Law Enforcement Agencies and In-Service Trainings were the Moving Force and Causal Factors Behind the Defendants Violation of Mr. Sholes' Constitutional Rights**

126.      MCSO and CPD officers are not sufficiently trained to utilize arrest control

techniques and tactics and attempt to supplement their lack of training with unjustified,

excessive force. This insufficient training was a casual factor in attacking Mr. Sholes.

127.      MCSO and CPD in-service training is *ad hoc* and does address specific needs of

the organization as shown by officer behavior.

128.      The named Defendants were inadequately trained, which contributed to their

improper and excessive force. By way of only a few examples of the Defendants'

inadequate training: (1) the Defendants used deadly force against an individual suspected

of only nonviolent misdemeanors; (2) the Defendants used deadly force ostensibly to

avoid the possibility of alternative deadly force (i.e., shooting Mr. Sholes); (3) the

Defendants used deadly force against a suspect whose back was turned and was simply

walking away.

129.      As the foregoing examples show, the individual Defendants acted as expected of

untrained officers in emotionally charged states.

130.     The responsibility for inadequate and outdated policies and training in effect at

the time of Mr. Sholes' injuries fall directly upon the County of Adams and the City of

Craig.

## V.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Excessive Force
### Violation of the 4th Amendment

131.      The Plaintiff hereby incorporates all other paragraphs of this Civil Rights

Complaint and Jury Demand as if set forth fully herein.

132.     42 U.S.C. § 1983 provides:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

133.     The named Defendants are persons for the purposes of 42 U.S.C. § 1983.

134.     The named Defendants at all times relevant to this action, acted under color of

state law in their capacity as ~~an~~ Moffat County Sheriff's Office deputies and City of

Craig Police Department officers, and their acts and/or omissions were conducted within

the scope of their official duties and employment.

135.     At the time of the complained of events, the Plaintiff had a clearly established

constitutional right under the Fourth Amendment to be secure in his person from

unreasonable seizure through excessive force by law enforcement.

136.     Any reasonable police officer knew or should have known of this right at the time of the complained of conduct as it was clearly established at that time.

137.     The named Defendants engaged in the use of force that was objectively unreasonable in light of the facts and circumstances confronting them, thereby violating the Plaintiff's Fourth Amendment right to be free from excessive force.

138.     As described in detail above, it was not objectively reasonable for the named Defendants to run the Plaintiff over with a car in the absence of any conduct or information indicating he posed a threat to the officers or any other person's safety.

139.     The acts or omissions of the named Defendants were the legal and proximate cause of Plaintiff's damages.

140.     As a proximate cause and result of the named Defendants' conduct, the Plaintiff suffered actual physical bodily and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, excruciating pain, and severe emotional distress.

141.     The Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgement interest and costs as allowable by federal law.

142.     As a direct and proximate result of the acts, omissions, and violations alleged above, the Plaintiff suffered damages, injuries, pain and suffering, emotional distress,

impairment of quality of life, past and future economic losses, including loss of earnings and loss of earning capacity, reasonable and necessary medical and other expenses.

143.　　In addition, Plaintiff is entitled to punitive damages against the named Defendants, in that their actions were taken maliciously, willfully, or with a reckless or wanton disregard of the constitutional rights of the Plaintiff.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Failure to Hire, Investigate, Train, Supervise, and Discipline
### *Monell* Claim
(Plaintiff Against Defendants Moffat County Sheriff's Office and City of Craig)

144.　　Plaintiff hereby incorporates all other paragraphs of this Civil Rights Complaint and Jury Demand as if fully set forth herein

145.　　Moffat County Sheriff's Office ("MCSO") failed to properly train, supervise, and discipline its employees, including the named Defendants, with respect to the use of force and their responsibilities related to off-duty interventions and interactions with members of the public.

146.　　~~Moffat County~~ MCSO further failed to properly train, supervise, and discipline its employees, by inculcating a responsibility on the part of the officers—through formal policy, training, and actual practices and habits within the department—to actively seek out potentially dangerous and violent interactions while off-duty, the consequences of which result in increased incidents of unwarranted and unnecessary force against members of the public and individuals with disabilities.

147.     ~~Moffat, through the Sheriff's Office,~~ MCSO failed to hire officers, specifically the named Defendants, in a manner that would not lead to the deprivation of the Plaintiff's constitutional rights.

148.     ~~Moffat, through the Moffat County Sheriff's Office,~~ MCSO also failed to discipline officers in a manner that would not lead to the unlawful use of force. The Sheriff's Office fails and refuses to discipline officers for the unlawful use of excessive force, sending a signal that ~~Moffat~~ MCSO not only tolerates, but actually endorses and awards, officers who use excessive force.

149.     ~~Moffat's~~ MCSO's failure to, in its supervisory duties, adequately investigate and hire, train, supervise, and discipline its officers with respect to the use of excessive force is a custom, policy, and/or practice of ~~Moffat~~ MCSO and a moving force behind the constitutional violation described herein.

150.     The constitutional violations—federal and state—perpetrated against the Plaintiff in this manner were a foreseeable consequence of ~~Moffat's~~ MCSO's actions and inactions.

151.     ~~Moffat~~ MCSO was deliberately indifferent to the constitutional rights of its citizens by failing to properly train, monitor, supervise, and discipline its employees with respect to the use of excessive force, aggressive off-duty policing, and interacting with members of the public and individuals with disabilities. ~~Moffat~~ MCSO could have and

should have pursued reasonable methods of training, monitoring, supervising, and disciplining its employees.

152.     ~~Moffat~~MCSO's policies, customs, and/or practices in failing to properly monitor, train, supervise, and discipline its employees were the causal force and proximate cause of the violation of the Plaintiff's federal and state constitutional rights.

153.     The acts or omissions of ~~Moffat~~MCSO caused Plaintiff damages in that he suffered extreme physical injuries and pain and extensive emotional and mental suffering during and after the assault.

154.     The actions or omissions of ~~Moffat~~MCSO as described herein deprived Plaintiff of the rights, privileges, liberties, and immunities, secured by the Constitution of the United States of America, and caused her other damages.

155.     The City of Craig failed to properly train, supervise, and discipline its employees, including the named Defendants, with respect to the use of force and their responsibilities related to off-duty interventions and interactions with members of the public and individuals with disabilities.

156.     The City of Craig (“Craig”) failed to properly train, supervise, and discipline its employees, including the named Defendants, with respect to the use of force and their responsibilities related to off-duty interventions and interactions with members of the public.

157.     Craig further failed to properly train, supervise, and discipline its employees, by inculcating a responsibility on the part of the officers—through formal policy, training, and actual practices and habits within the department—to actively seek out potentially dangerous and violent interactions while off-duty, the consequences of which result in increased incidents of unwarranted and unnecessary force against members of the public and individuals with disabilities.

158.     Craig, through the Sheriff's Office, failed to hire officers, specifically the named Defendants, in a manner that would not lead to the deprivation of the Plaintiff's constitutional rights.

159.     Craig, through the Craig Police Department, also failed to discipline officers in a manner that would not lead to the unlawful use of force. The Police Department fails and refuses to discipline officers for the unlawful use of excessive force, sending a signal that Craig not only tolerates, but actually endorses and awards, officers who use excessive force.

160.     Craig's failure to, in its supervisory duties, adequately investigate and hire, train, supervise, and discipline its officers with respect to the use of excessive force is a custom, policy, and/or practice of Craig and a moving force behind the constitutional violation described herein.

161.     The constitutional violations—federal and state—perpetrated against the Plaintiff in this manner were a foreseeable consequence of Craig actions and inactions.

162.     Craig was deliberately indifferent to the constitutional rights of its citizens by failing to properly train, monitor, supervise, and discipline its employees with respect to the use of excessive force, aggressive off-duty policing, and interacting with members of the public and individuals with disabilities. Craig could have and should have pursued reasonable methods of training, monitoring, supervising, and disciplining its employees

163.     Craig's policies, customs, and/or practices in failing to properly monitor, train, supervise, and discipline its employees were the causal force and proximate cause of the violation of the Plaintiff's federal and state constitutional rights.

164.     The acts or omissions of Craig caused Plaintiff damages in that she suffered extreme physical injuries and pain and extensive emotional and mental suffering during and after the assault.

165.     The actions or omissions of Craig as described herein deprived Plaintiff of the rights, privileges, liberties, and immunities, secured by the Constitution of the United States of America, and caused him other damages.

**THIRD CLAIM FOR RELIEF**
**Colo. Rev. Stat. § 13-21-131**
**Colo. Const. Art. II, Section 7 – *Excessive Force***
(Against the ~~named~~ individual Defendants)

166.     Plaintiff hereby incorporates all other paragraphs of this Civil Rights Complaint and Jury Demand as if set forth herein.

167.     At all relevant times, the named Defendants were "peace officers" under C.R.S. § 24-31-901(3), employed by a local government and therefore subject to C.R.S. § 13-21-131.

168.     At all relevant times, the named Defendants acted under color of state law in their capacity as a Moffat or Craig law enforcement officers.

169.     Plaintiff has a protected interest under Colorado Constitution Article II, Section 7, in being free from the use of excessive force by law enforcement personnel.

170.     The named Defendants violated Plaintiff's state constitutional rights by using objectively unreasonable force against Plaintiff

171.     The named Defendants seized Plaintiff by means of unreasonable physical force including but not limited to, striking Plaintiff with a car.

172.     The named Defendants had no reasonable basis to believe Plaintiff posed a threat of harm to him or any other person.

173.     The named Defendants did not have a legally valid basis to seize Plaintiff in this manner and with the level of force used under the circumstances presented.

174.     The named Defendants' use of force against Plaintiff, as described here, was objectively unreasonable in light of the circumstances confronting them before and during the encounter with Plaintiff.

175.     The named Defendants subjected or caused Plaintiff to be subjected to the

deprivation of individual rights secured by the bill of rights of the Colorado Constitution.

176.     The named Defendants did not act upon a good faith and reasonable belief that

their actions in using unreasonable and excessive force against Plaintiff was lawful.

177.     The actions and inactions of the named Defendants' employers, Moffat and Craig,

through their respective law enforcement agencies, were moving forces behind and causal

factors of the underlying constitutional violations to the Plaintiff.

178.     Given that the actions and inactions of ~~Moffat,~~ MCSO as described throughout

this Complaint, were causal factors of the underlying constitutional violations, pursuant

to C.R.S. § 13-21-131(4)(a), ~~Moffat~~ MCSO must indemnify Defendants McIntyre,

Businger, Luster, Hammer, Montoya, and Siminoe.

179.     Given that the actions and inactions of Craig, as described throughout this

Complaint, were causal factors of the underlying constitutional violations, pursuant to

C.R.S. § 13-21-131(4)(a), Craig must indemnify Defendants Conrad, Caudell, Laehr, and

Mendoza.

180.     Also pursuant to C.R.S. § 13-21-131(4)(a), even if ~~Moffat~~MCSO or Craig

determines that the named Defendants did not act upon a good faith and reasonable belief

that their actions were lawful, then the named Defendants merely "shall not be

indemnified [by ~~Moffat~~ MCSO or Craig] for five percent of the judgement or settlement or twenty-five thousand dollars, whichever is less."

181.    In other words, even if ~~Moffat~~ MCSO and Craig's actions and inactions are not found to be causal factors in the underlying violations, ~~Moffat~~ MCSO and Craig can only escape indemnification in the amount of five percent of the judgement or settlement or twenty-five thousand dollars, whichever is less. Even so, under this scenario, "if [the named Defendants'] portion of the judgement is uncollectible, [~~Moffat~~ MCSO and Craig] shall satisfy the full amount of the judgement or settlement." C.R.S. § 13-21-131(4)(a). [3]

182.    By failing to sufficiently train and discipline law enforcement officers regarding de-escalation and the proper use of force, and interacting with members of the public, among other things, ~~Moffat~~ MCSO and Craig caused the Plaintiff to be subjected to a deprivation of his civil rights.

183.    The involvement of high-ranking law enforcement officials from both jurisdictions was the cause and moving force of the Plaintiff's civil rights deprivations.

184.    ~~Moffat~~ MCSO and Craig failed to create and oversee appropriate expectations for responsible behavior, and these failures were the moving force behind the named Defendants' unlawful use of force against the Plaintiff.

---

[3] "[A] plaintiff may be the beneficiary of indemnification by the municipality if the peace officer does not have the funds to pay the judgment." Ditirro v. Sando, 520 P.3d 1203, 1209 (Colo. App. 2022).

185.	~~Moffat~~ MCSO and Craig, through their respective law enforcement agencies, also failed to investigate and hire officers in a manner that would not lead to unlawful use of force by law enforcement officers.

186.	~~Moffat and Craig are liable for the acts and omissions of their agents and/or employees, and for the herein described acts by the named Defendants, who acted within the scope and course of their employment.~~

187.	The named Defendants' conduct described herein was attended by circumstances of malice, or willful and wanton conduct, which the named Defendants must have realized was dangerous, or that was done heedlessly and recklessly, without regard to the consequences, or of the rights and safety of others, particularly Plaintiff.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgement in his favor, and against the Defendants, and award all relief as allowed by law and equity as appropriate, including, without limitation, the following:

a.	Declaratory and injunctive relief;

b.	Actual economic damages as established at trial;

c.	Compensatory damages, including, without limitation, those for past and future pecuniary and non-pecuniary losses, pain and suffering, emotional distress, impairment of quality of life, reasonable and necessary medical and other expenses;

d.   Pre- and post-judgement interest at the highest lawful rate;

e.   Attorneys' fees and costs of associated with this action; and

f.   Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Dated this August 15, 2024

*/s/ Conor O'Donnell*
Conor O'Donnell
Igor Raykin
2851 S. Parker Rd.
Ste 150
Aurora, Colorado 80014
(720) 863-4256 (p)
igor@coloradolawteam.com
conor@coloradolawteam.com