IN THE UNITED STATES COUR
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-01664-STV

TANNER SHOLES,

    Plaintiff,

v.

THE CITY OF CRAIG COLORADO, et al.,

Defendants

---

**PLAINTIFF'S RESPONSE TO MOFFAT COUNTY DEFENDANTS' MOTION TO DISMISS**

---

Plaintiff, Tanner Sholes ("Mr. Sholes" or "Plaintiff"), by and through his attorneys, Kishinevsky & Raykin, LLC, hereby responds to Defendants City of Craig Colorado, Dalton Caudell, and Tracy Mendoza (collectively the "Craig Defendants") Motion to Dismiss (ECF 34) (hereinafter the "Motion"), requests that the Court deny the Motion, and in support thereof states as follows:

**LEGAL STANDARDS**

A. *Qualified Immunity and Motions to Dismiss*

Public officials are not entitled to qualified immunity for (1) violating a constitutional right where (2) the right was "clearly established at the time." *Thompson v. Ragland*, 23 F.4th 1252, 1255 (10th Cir. 2022) (cleaned up). On a motion to dismiss, the facts as alleged are reviewed and defendants face "a more challenging standard of review." *Id.*, at 1256.

B. *The Constitutional Right to be Free from Unreasonable Force*

Plaintiff has a clearly established right to be free from unreasonable deadly force where he did not pose a "threat of serious physical harm," *Cordova v. Aragon*, 569 F.3d 1183 (10th Cir.

2009), or where any such threat "had passed" by the time Defendants used force, *Reavis v. Frost*, 967 F.3d 978, 989 (10th Cir. 2020). Whether the force used against Plaintiff was reasonable depends on factors including "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Of these, the second "is undoubtedly the most important and fact intensive factor." *Huff v. Reeves*, 996 F.3d 1082, 1089 (10th Cir. 2021) (cleaned up).

Whether a threat is serious depends on factors including "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance . . ."; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008); *but see Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable.").

## RELEVANT FACTS

Plaintiff alleged that Defendants violated his clearly established right to be free from unreasonable deadly force. *See e.g.*, ECF 32, ¶ 135. Contact began when calls notified the Defendants that Plaintiff was carrying what appeared to be a rifle in the Town of Craig. ECF 33, ¶ 18-19. Importantly, Plaintiff was not actually carrying a rifle, he was carrying a BB-gun. *Id.*, ¶ 96. The BB-gun was slung on the Plaintiff's back and covered with an outer shirt, meaning Plaintiff could not access it. *Id.*, ¶ 21. The callers reported the Plaintiff out of caution; the second explicitly stated that the Plaintiff had done nothing wrong. *Id.*, ¶ 21.

Defendants surveilled the Plaintiff for nearly two hours. *Id.*, ¶ 22. Throughout this time, Plaintiff peacefully travelled through Craig and Moffat County. Plaintiff passed approximately

seventy homes without incident. *Id.*, ¶¶ 36, 40. Plaintiff did not threaten nor attempt to enter any of the homes. *Id.*, ¶¶ 37-38. Eventually, Plaintiff turned on an unmarked road. He then passed two more homes without incident. *Id.*, ¶ 49.

After Plaintiff turned down the road, the Defendants met and explicitly planned to run the Plaintiff over. *Id.*, ¶ 56. The Defendants pulled up behind the Plaintiff, without identifying themselves, and ordered him to drop to the ground. *Id.*, ¶ 80. The Defendants then identified themselves as law enforcement and repeated their order. *Id.*, ¶ 82. The Plaintiff held his empty hand in the air and took a few more steps. *Id.*, ¶ 83. Twenty seconds later, the Defendants rammed him with their car. *Id.*, ¶¶ 87-88.

## ANALYSIS

### A. *Defendants violated Plaintiff's clearly established right to be free from unreasonable force*

Plaintiff possesses a Fourth Amendment right to be free from unreasonable force including where he held his hands in the air and walked a few feet forward. *Huff,* 996 G.3d at 1091 (holding shooting a woman who "had her hands up in the air" and "ran a few feet into [a] field and turned [] toward the vehicle of [law enforcement] violated the Fourth Amendment). Plaintiff's right includes freedom from deadly force once a threat has elapsed. *Reavis*, 967 F.3d, at 990-92 (concluding that even where a suspect posed a threat to officer safety, once the immediate threat passed, deadly force was unreasonable).

Under extremely similar circumstances, courts within the Tenth Circuit have recognized Plaintiff's right. *See e.g., Womack v. Rodriguez*, No. 2:20-cv-02638-HLT, 2023 U.S. Dist. LEXIS 25958, at *17 (D. Kan. Feb. 15, 2023); *Clark v. Thomas*, 505 F. Supp. 2d 884, 897 (D. Kan. 2007). In *Womack*, the District Court ruled that "it would have been obvious to a reasonable officer that intentionally striking [the plaintiff] with his patrol truck to get him to stop

would have been unreasonable under the Fourth Amendment." *Womack*, 2023 U.S. Dist. LEXIS 25958, at *17. In *Clark,* the District Court held that "unreasonably and unnecessarily striking plaintiff with [a] police vehicle, without warning, while plaintiff fled officers on foot without presenting any threat to those officers—is prohibited under the Fourth Amendment's reasonableness standard." *Clark,* 505 F. Supp. 2d at 897. Both *Womack* and *Clark* present highly similar circumstances to those involving the Plaintiff. In each case, the District Court held the use of deadly force was clearly unreasonable.

Comparatively, here, Defendants executed deadly force while Plaintiff was walking away from police, down an unpopulated road, with his hands held in the air. The only person reasonably close was in his house a significant distance away and Plaintiff had already passed seventy-two houses without incident. Plaintiff had no way of accessing the BB-gun slung on his back. Under these circumstances, Plaintiff did not present a serious, imminent, threat. Accordingly, Plaintiff had a clearly established right to be free from the Defendants use of unreasonable deadly force.

Cases relied upon by the Defendants clarify the contours of Plaintiff's right.  In *George*, the plaintiff: 1) "reached behind his back and retrieved a handgun," 2) "moved the handgun up to his chest area," 3) "demonstrat[ed] the intent to shoot himself," 4) "held the gun . . . with the muzzle pointing at his chest [with] his thumb on the trigger," and 5) ignored "approximately forty-six [commands] . . . to drop his handgun." *Est. of George v. City of Rifle*, 85 F.4th 1300, 1306 (10th Cir. 2023). Here, Plaintiff never brandished or otherwise held a firearm; 2) never pointed a firearm (or even the BB-gun) at himself or officers; and 3) was given only minimal commands and twenty seconds to comply. The difference in facts between *George* and the Plaintiff's case show that Plaintiff never represented the kind of threat—*or any threat*—sufficient to warrant deadly force.

Similarly, in *Arnold v. City of Olathe,* officers "engaged [the plaintiff] for an extended period [—over *three* (3) *hours*—] without success." *Arnold v. City of Olathe*, 35 F.4th 778, 792 (10th Cir. 2022). During the altercation, the plaintiff also retreated into an interior room and "resist[ed] arrest by pointing a firearm at the officer, refusing to drop the firearm, and verbally threatening the officers." *Ibid.* Again, *none* of the facts occurred in Plaintiff's interaction with the Defendants.

In *George* and *Arnold*, the plaintiffs made clear threats to use firearms violently against themselves, law enforcement, or others. Here, the Plaintiff made *no* threat, nor even gave the indication of a threat. *See Larsen* 511 F.3d at 1260 (noting factors (2) any "hostile motions" and (4) "the manifest intentions of the suspect"). *George* and *Arnold* are only similar in that they involve criminal suspects. Beyond that point, all similarity ends. Objectively, the totality of the circumstances confronting the Defendants did not support the use of deadly force against the Plaintiff. Because the Plaintiff has Fourth Amendment right to be free from unreasonable deadly force, the Defendants' actions violated his clearly established right.

### B. Each <u>Graham</u> factor favors the Plaintiff

Each *Graham* factor favors the Plaintiff. *Graham*, 490 U.S. at 396. Reasonableness of force is an objective inquiry. *Id.* at 397. Through this inquiry, the Court must consider the totality of the circumstances, rather than limiting itself to a "mechanical application" of the noted factors. *Ibid.* (quoting *Bell v. Wolfish*, 441 U.S. 502, 559 (1979)). Thus, the Court must consider that: 1) the Defendants were notified of the Plaintiff based on calls reporting concern, but no threating or otherwise criminal behavior; 2) Plaintiff's alleged rifle was actually a BB-gun; 3) Plaintiff's BB-gun was physically inaccessible throughout the encounter with law enforcement; 4) Plaintiff passed approximately seventy-two houses without incident before the Defendants

decided to execute deadly force; 5) Plaintiff was holding his hands in the air when the Defendants executed deadly force; 6) Defendants gave Plaintiff only twenty seconds to comply before executing deadly force. None of these facts support the use of deadly force.

Defendants' argument for reasonableness ignores these facts. Instead, Defendant argues that based on the Defendants prior experiences with Plaintiff Plaintiff's unknown mental state, and other, unrelated, statements, deadly force was reasonable. ECF 34, at 9. Defendants' characterization of Plaintiff's mental state as "unknown" accurately describes these circumstances. Rather than relying on what *actually* happened, Defendants' argument relies on what could have happened, and, more correctly, what was *possible*. While the Defendants' beliefs are relevant to this inquiry, the inquiry itself is objective. *Graham*, 490 U.S., at 397. None of the Defendants' concerns actually occurred. While the Defendants may have expected a violent encounter, in reality, it was not. The Defendants' suspicions and prior beliefs are not factual circumstances that overwhelm the actual circumstances at the time. *See Torres v. Madrid*, 60 F.4th 596, 600 (10th Cir. 2023) ("facts unknown to officers at the moment they use force are not relevant to the qualified-immunity analysis").

Moreover, Plaintiff's record does not justify the use of deadly force. *See Garner*, 471 U.S. at 11 (holding using deadly force against fleeing felony suspects is unreasonable); *Reavis,* 967 F.3d at 990-92 (concluding deadly force is only reasonable while a serious threat is imminent, and not afterwards). Defendants' argument leads to the conclusion that prior criminal activity, and the suspicion of future criminal activity itself, justifies the use of deadly force. This conclusion is directly contrary to Fourth Amendment precedent *limiting* the use of deadly force to imminent, and actual, threats. *Ibid.* Plaintiff's previous record with law enforcement may have informed the Defendants in how they decided to—*reasonably*—contact him. Plaintiff's record does not justify deadly force.

i. **Because Plaintiff was suspected of a misdemeanor, the first *Graham* factor weighs in his favor.**

As pled, Plaintiff's suspected criminal activities at the time were misdemeanors. ECF 32, ¶ 62 (violation of a restraining order and impeding a highway). *Graham* "weigh[s] against the use of significant force if the crime at issue is a misdemeanor." *Lee v. Tucker*, 904 F.3d 1145, 1149 (10th Cir. 2018). Accordingly, the first factor favors Plaintiff.

Defendants assert that Plaintiff actually committed a felony. ECF 34, at 7. This assertion challenges the facts as alleged. When qualified immunity is raised in a motion to dismiss, it is the conduct as alleged that is evaluated. *Thompson*, 23 F.4th at 1256. Because Plaintiff alleges that he was only suspected of a misdemeanor by the Defendants, the Court must analyze the Defendants' conduct based on that allegation. *Ibid.* Under such circumstances, the first *Graham* factor clearly supports the Plaintiff.

Defendants' claim is also legally and factually incorrect. Plaintiff did not actually possess a firearm. Plaintiff possessed a BB-gun and possessing a BB-gun is not a felony. *See People v. Serna-Lopez*, 2023 COA 21, 531 P.3d 410, 419-20. (concluding that a BB-gun could meet the definition of a "deadly weapon"); *see also* C.R.S. § 18-1-901(e) (defining "deadly weapon" to *explicitly include* "firearms"). The key feature of a firearm is that it is powered by "explosive charge." *Ibid.* Because Plaintiff did not possess a firearm, he did not engage in felonious behavior. While Defendants' suspicion is relevant to their use of force, the actual facts of what occurred must be kept in mind. Moreover, Tenth Circuit precedent does not hold, universally, that felonies swing the first *Graham* factor in favor of law enforcement.

*Vette,* cited by Defendants, did not consider the nature of Plaintiff's suspected offense, only its class. *Vette v. Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021). *Vette,* assumed the classification was sufficient because "the remaining factors weigh[ed] so strongly against

significant use of force." *Ibid.* (citing *Estate of Valverde v. Dodge,* 967 F.3d 1049, 1061 n.2 (10th Cir. 2020)). *Valverde* relied on the fact that the suspected offenses were "notoriously linked to violence" to support considering them serious crimes. *Ibid. Valverde* also relied on *Henry v. Story*, which itself relied on the inherently dangerous nature of the suspected crime. *Henry v. Storey*, 658 F.3d 1235, 1239 (10th Cir. 2011) (noting the "strong incentive" to evade arrest with a stolen car). The Tenth Circuit has previously recognized that the relationship of violence to the suspected offense is significant for the reasonableness inquiry. *See Estate of Ronquillo v. City & Cnty. of Denver,* 720 F. App'x 434, 438 (10th Cir. 2017) (unpublished) ("Defendants do not contend that any of [plaintiff's] alleged crimes were accompanied by violence. We thus weigh this factor in favor of the estate.")

Considering this caselaw, suspecting the Plaintiff of a felony should not mandate weighing the first factor in Defendants' favor. Rather, the Court should consider that Defendants only suspected Plaintiff of possession, nothing more, meaning no violent or threatening conduct. ECF 34, at 7. If the Court agrees with the Defendants' formulation, the first *Graham* factor should favor neither side, because Plaintiff was not suspected of any kind of seriously dangerous conduct. Should the Court consider this factor under the facts as alleged, the factor should weigh in Plaintiff's favor. Under either formulation, Plaintiff's suspected criminal activity does not support deadly force.

    ii.    **Because the Plaintiff posed *no* threat, the second *Graham* factor weighs in his favor.**

Objectively, Plaintiff posed no "immediate threat" *Graham*, 490 U.S. at 396. "[D]eadly force is justified only . . .[where] there was a threat of serious physical harm to himself or others." *Cordova,* 569 F.3d at 1192. The threat must be also be imminent. *Reavis,* 967 F.3d at 989. Plaintiff neither posed an actual nor imminent threat.

The first *Larsen* factor considers "whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands." *Ibid.* However, the inquiry remains based on the totality of the circumstances. *Ibid.* As alleged, Plaintiff did not initially respond to commands from an unknown party, nor was he legally required to do so. Once the Defendants identified themselves, Plaintiff held his hands in the air. While Plaintiff did not immediately drop to the ground, holding his hands in the air to show he was unarmed cannot be considered pure non-compliance. Plaintiff indicated he heard the Defendants command and showed he posed no threat. Plaintiff could not "drop his [BB-gun]" because he was not holding the BB-gun. *Larsen*, 511 F.3d at 1260. Plaintiff took a few more steps and within seconds the Defendants ran him over. *Cf. Huff*, 996 F.3d at 1091. This is not a failure to comply or drop a weapon as conceived of in *Larsen*. 511 F.3d at 1260.

Defendants cite *George* for the proposition that Plaintiff "had no intentions of surrendering peacefully." *Id.* at 9. However, in *George*, the plaintiff in *George* actually possessed a firearm, pointed it at himself, and made statements clearly indicating resistance to arrest such as "'I'm not going to jail!'" *George*, 85 F.4th at 1306. The officers in *George* also exercised significant restraint and, despite the plaintiff *pointing* a gun at himself, waited to exercise any force until the plaintiff began "running" towards a populated area. *Ibid.* Contrarily, here, Plaintiff travelled from a more populated to less populated area and passed seventy-two homes without incident. *George* shows the difference between the situation confronting the Defendants and one that showed an actual, serious, and immediate threat. Here, Plaintiff was not a threat. *See also Arnold*, 35 F.4th at 792 (discussing factors supporting a finding of serious and immediate threat, including "pointing a firearm at [an] officer . . . and verbally threatening the officers.").

Plaintiff also made no "hostile motions," thus, the second *Larsen* factor favors the Plaintiff. *Larsen*, 511 F.3d at 1260. The fourth factor, "the manifest intentions of the suspect," mirrors this

analysis. *Ibid.* Just as Plaintiff made no hostile motions, his manifest intentions also suggested peacefulness. Plaintiff passed seventy-two houses without incident, and made no threatening gestures. His manifest intentions were clearly to continue walking, and nothing more. Thereby, both the second and fourth *Larsen* factors favor the Plaintiff.

Finally, any proximity between the Plaintiff and the Defendants occurred when the Defendants drove up behind the Plaintiff and then ran him over. *See Larsen*, 511 F.3d at 1260 (considering the proximity between suspects and officers). Defendant claims that because "plaintiff was armed with a gun . . . this sub-factor favors objective reasonableness." ECF 34, at 8. This argument is a non-starter. Not only did Plaintiff *not* possess a gun, but his BB-gun was inaccessible. The Defendants chose to approach him, while in police vehicles, which they remained in Plaintiff was severely injured. These facts dramatically decreased any risk posed to the Defendants. This *Larsen* factor does not support using deadly force.

As addressed above, extraneous information based on prior encounters and information does not alter what actually occurred. During the actual events of this encounter, Defendants learned that neither Plaintiff's mother nor his former girlfriend had any information or knowledge about Plaintiff possessing a firearm. ECF 32, ¶ 23. Any *previous* threat Plaintiff may or may not have made does not justify the use of deadly force in this encounter. *Huff*, 996 F.3d at 1091. To justify deadly force, the Defendants must have actually faced a serious and imminent threat, not the specter of one. Under the actual circumstances, Plaintiff was neither a serious nor imminent threat. The Plaintiff's circumstances are far more similar to *Clark* and *Huff* than to *George*, *Arnold*, or *Larsen* and the second *Graham* factor falls in Plaintiff's favor.

iii. **The third *Graham* factor favors the Plaintiff**

Plaintiff did not either actively resist or attempt to flee the Defendants. Rather, once they identified themselves, he raised his hands in the air and took a few more steps. Had Plaintiff continued to walk away, the Defendants may have been justified in some use of force to restrain him. However, Defendants are not correct that walking away from law enforcement justifies deadly force. *Garner*, 471 U.S. at 11 ("The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable."). At worst, Plaintiff was fleeing the Defendants. Under a more thorough analysis, he took a few steps while his hands were raised. *Cf. Huff,* 996 F.3d at 1091. Neither situation justifies the use of deadly force.

Defendants tacitly concede by noting that "'[Courts] have found this third factor to weigh in favor of some degree of physical coercion . . .'" ECF 34, at 9 (quoting *Anderson v. DelCore*, 79 F.4th 1153, 1165 (10th Cir. 2023) (brackets added by Defendant). "*Some*" force is not *deadly* force. Deadly force is the absolute zenith of lawful force. *Deadly* force must be justified by an immediate threat. Plaintiff posed no threat so deadly force was clearly unjustified.

    **C. Defendants Violated Plaintiff's Clearly Established Rights through their Own Actions and Inactions and through Failing to Intervene**

The Defendants actively participated in the planning and perpetration of deadly force against the Plaintiff. Defendants' participation in this action and failure to prevent it make them liable for Plaintiff's injuries. *Bledsoe v. Carreno*, 53 F.4th 589, 616 (10th Cir. 2022). Defendants' argument is pointlessly over formulistic. The Complaint alleges that the Defendants all planned or agreed with the plan to run over the Plaintiff. ECF 32, ¶ 56. During that time, each of the individual Defendants had a realistic opportunity to intervene. The Defendants also had a realistic opportunity to intervene *at any time* before running over the Plaintiff. The Defendants are liable for that failure just as they are liable for their individual actions and inactions.

Defendants' argument is overly formulistic because it forbids the Court from making any logical inferences. Under the pleading standard, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Under that standard, plaintiffs' allegations need only be sufficient to raise their "right to relief above the speculative level." *Lax v. APP of N.M. ED, PLLC,* Nos. 22-2057, 22-2058, 2022 U.S. App. LEXIS 19279, at *27 (10th Cir. July 13, 2022). Plaintiff's allegations provide more than sufficient factual material for the Court to infer that each of the Defendants participated and failed to intervene in the decision to run over the Plaintiff. That is sufficient to overcome a motion to dismiss.

### D. *Plaintiff states a valid Monell claim*

Plaintiff alleges a valid *Monell* claim. To state a claim, Plaintiff must state "enough facts to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Iqbal*, 556 U.S. at 678 (discussing reasonable inferences). For municipal liability, the Plaintiff must show "(1) that a municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004). Plaintiff alleged municipal liability based on the City of Craig's "widespread and deliberately indifferent customs, habits, practices, and/or policies of condoning and ratifying the excessive use of force [which] led to the [Defendants'] decision to use unreasonable and extreme force against the [Plaintiff]." ECF 32, ¶ 113. Throughout the Complaint, Plaintiff presented sufficient factual allegations for the Court to draw reasonable inference that the City Defendant is liable for this misconduct. *Iqbal*, 556 U.S. at 678.

First, Plaintiff alleged that the Defendants were members of the Special Response Team ("SRT"). ECF 32, ¶ 16. The SRT members were activated by Defendant McIntyre, the Undersheriff of Moffat County. *Ibid.* As the ranking officer and commander of the SRT, Defendant McIntyre was in command of the Defendants as they surveilled and contacted the Plaintiff. Moreover, as a multijurisdictional response team, the SRT clearly operated with the authority of the City of Craig. Second, Plaintiff alleged that after he turned down the unmarked county road, the Defendants developed a plan to run the Plaintiff over with a police vehicle. *Id.*, ¶ 55-56. None of the Defendants contested or otherwise tried to prevent or oppose the use of deadly force against Mr. Sholes.

These factual allegations lead to several logical conclusions. First, the SRT was a pre-existing multi-jurisdictional organization with its own policies and procedures. Second, the SRT, at least in this instance, was commanded by Defendant McIntyre, and staffed with officers from Craig Police, including Commander Doug Conrad. ECF 32, ¶ 22. Third, the use of deadly force was discussed by these senior officers, agreed upon, and ratified by Defendant McIntyre, the second-highest ranking law enforcement individual in Moffat County.Reasonably, the SRT operated pursuant to policies and procedures whether formal or informal. Those policies and procedures were known by the collective senior officers involved in the decision to utilize deadly force against the Plaintiff. The senior officers believed their decision to use deadly force under the circumstances as alleged complied with the SRT's policies and procedures, as well as those of their regular departments.

*Monell* does not require an explicit policy. Rather, a municipal policy may "take the form of . . . 'a formal regulation or policy statement' . . . an informal custom  . . . 'the decisions of employees with final policymaking authority' . . . the ratification by such final policymakers of the decisions . . . or [] the 'failure to adequately train or supervise employees . . .'" *Bryson v. City*

*of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010). Here, the facts alleged by the Plaintiff satisfy several of these options. First, logically, the SRT must have governing policies. Those policies permitted the SRT to engage in unconstitutional use of force. Second, if the SRT lacked such policies, the team members still believed they were acting with the force and ratification of their respective law enforcement departments when they chose to violate the Plaintiff's rights. That belief derived from a policy or custom, whether formal or informal. Third, the SRT's decision was ratified by Undersheriff McIntyre. As the second-highest ranking law enforcement official in the county, and the officer directly in charge of the SRT members, including Craig police officers, Defendant McIntyre was both a final policymaker and an individual qualified to ratify the decisions of the SRT. Fourth, the officers' collective decision to violate the Plaintiff's rights strongly supports an inference of improper training and supervision because, without such a failure, they would have understood that their conduct violated the Plaintiff's constitutional rights. The involvement of high-ranking officers of both the Sheriff's Office and the Craig Police Department, and the fact that no officers were disciplined for their actions lends credence to the inference that the City ratified the officers' decisions.

Moreover, the Defendants' use of force, when clearly unreasonable under the circumstances, strongly supports that the officers themselves lacked adequate training or supervision. Again, plaintiff must state "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. The Court may then "draw [] reasonable inference that the defendant is liable for the misconduct alleged." Plaintiff's *Monell* claims states sufficient factual allegations to reasonable infer the City of Craig failed to train and supervise, and ratified the officers' decisions.

   E. ***Plaintiff plausibly alleges a constitutional violation to C.R.S § 13-21-131 and Article II of the Colorado Constitution***

Plaintiff alleged a constitutional violation pursuant to C.R.S. § 13-21-131, that the Defendants violated his Colorado constitutional right to be free from excessive force. ECF 32, ¶ 166-186. The Fourth Amendment to the U.S. Constitution and Article II, Section 7 of the Colorado Constitution are functionally identical, thus, they may be examined under the same standards. Because Plaintiff properly pleaded a violation of his Fourth Amendment rights, he also properly pleaded a violation of his Colorado Constitutional rights. Thus, Defendant's argument is unavailing and should be disregarded.

## CONCLUSION

For the foregoing reasons, the Court should deny the Defendants' Motion to Dismiss.

Dated this September 30, 2024

*s/Conor O'Donnell*
Igor Raykin
Michael Nolt
Conor O'Donnell
Kishinevsky & Raykin, LLC
2851 S. Parker Rd., Ste. 600
Aurora, CO 80014
igor@coloradolawteam.com
michael@coloradolawteam.com
conor@coloradolawteam.com
**Counsel for Plaintiff**

## CERTIFICATE OF SERVICE

I hereby certify that on this September 30, 2024 a true and correct copy of the foregoing **PLAINTIFF'S RESPONSE TO MOFFAT COUNTY DEFENDANT'S MOTION TO DISMISS** was electronically served to the following:

David Goddard
Bruno, Colin, Goddard & Lowe, P.C.
1120 Lincoln Street, Suite 1606
Denver, CO 80203
dgoddard@brunolawyers.com
*Counsel for Moffat County Defendants*

Johnathan Eddy
Eric Ziporin
SGR, LLC
3900 East Mexica Ave., Suite 700
Denver, CO 80210
jeddy@sgrllc.com
eziporin@sgrllc.com
*Counsel for City of Craig, Daulton Caudell, Tracey Mendoza*

*s/Krystle Jennings*

Krystle Jennings, Paralegal
Kishinevsky & Raykin, LLC