# IN THE UNITED STATES COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-01664-STV

TANNER SHOLES,

    Plaintiff,

v.

THE CITY OF CRAIG COLORADO, et al.,

    Defendants

---

### PLAINTIFF'S RESPONSE TO MOFFAT COUNTY DEFENDANTS' MOTION TO DISMISS

---

Plaintiff, Tanner Sholes ("Mr. Sholes" or "Plaintiff"), by and through his attorneys, Kishinevsky & Raykin, LLC, hereby responds to Defendants Moffat County Sheriff, Chip McIntyre, Nate Businger, Kurtis Luster, Brandon Montoya, and Matt Hammer's (herein the "Defendants") Motion to Dismiss (ECF 33) (hereinafter the "Motion"), and requests that the Court deny the Motion, and in support thereof states as follows:

## LEGAL STANDARDS

**A.** *Qualified Immunity and Motions to Dismiss*
Public officials are not entitled to qualified immunity for (1) violating a constitutional right where (2) the right was "clearly established at the time." *Thompson v. Ragland*, 23 F.4th 1252, 1255 (10th Cir. 2022) (cleaned up). On a motion to dismiss, the facts as alleged are reviewed and defendants face "a more challenging standard of review." *Id.*, at 1256.

**B.** *The Constitutional Right to be Free from Unreasonable Force*

Plaintiff has a clearly established right to be free from unreasonable deadly force where he did not pose a "threat of serious physical harm," *Cordova v. Aragon*, 569 F.3d 1183 (10th Cir. 2009), or where any such threat "had passed" by the time Defendants used force, *Reavis v. Frost*, 967 F.3d 978, 989 (10th Cir. 2020). Whether the force used against Plaintiff was reasonable depends on factors including "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Of these, the second "is undoubtedly the most important and fact intensive factor." *Huff v. Reeves*, 996 F.3d 1082, 1089 (10th Cir. 2021) (cleaned up).

Whether a threat is serious depends on factors including "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance . . ."; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008); *but see Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable.").

**RELEVANT FACTS**

Plaintiff alleged that Defendants violated his clearly established right to be free from unreasonable deadly force. *See e.g.*, ECF 32, ¶ 135. Contact with the Defendants began when they received calls notifying them that Plaintiff was carrying what appeared to be a rifle in the Town of Craig. ECF 33, ¶ 18-19. Importantly, Plaintiff was not actually carrying a rifle; he was carrying a BB-gun. *Id.*, ¶ 96. The BB-gun was slung on the Plaintiff's back and covered with an outer shirt, meaning Plaintiff could not access it. *Id.,* ¶ 21. The callers only reported the Plaintiff out of caution; the second explicitly stated that the Plaintiff had done nothing wrong. *Id.*, ¶ 21.

Defendants surveilled the Plaintiff for nearly two hours. *Id.*, ¶ 22. Throughout this time, Plaintiff peacefully travel through Craig and Moffat County. Plaintiff passed approximately seventy homes without incident. *Id.*, ¶¶ 36, 40. Plaintiff did not threaten nor attempt to enter any of the homes. *Id.*, ¶¶ 37-38. Eventually, Plaintiff turned on an adjacent road. He then passed two more homes without incident. *Id.*, ¶ 49.

After Plaintiff turned down the road, the Defendants met and explicitly planned to run the Plaintiff over. *Id.*, ¶ 56. The Defendants pulled up behind the Plaintiff, without identifying themselves, and ordered him to drop to the ground. *Id.*, ¶ 80. The Defendants then identified themselves as law enforcement and repeated their order. *Id.*, ¶ 82. The Plaintiff held his empty hand in the air and took a few more steps. *Id.*, ¶ 83. Twenty seconds later, the Defendants rammed him with their car. *Id.*, ¶¶ 87-88.

## ANALYSIS

### A. *Plaintiff has a clearly established right to be free from unreasonable force*

Plaintiff possesses a Fourth Amendment right to be free from unreasonable force including where he held his hands in the air and walked a few feet forward. *Huff,* 996 G.3d at 1091 (holding shooting a woman who "had her hands up in the air" and "ran a few feet into [a] field and turned [] toward the vehicle of [law enforcement] violated the Fourth Amendment). Plaintiff's right includes freedom from deadly force once a threat has elapsed. *Reavis*, 967 F.3d, at 990-92 (concluding that even where a suspect posed a threat to officer safety, once the immediate threat passed, the defendant officer's use of deadly force on a fleeing motorist violated clearly established law).

Plaintiff's right to be free from unreasonable deadly force is so well-established that courts have recognized it in remarkably similar circumstances. *See e.g., Womack v. Rodriguez*, No. 2:20-cv-02638-HLT, 2023 U.S. Dist. LEXIS 25958, at *17 (D. Kan. Feb. 15, 2023); *Clark v.*

*Thomas*, 505 F. Supp. 2d 884, 897 (D. Kan. 2007). In *Womack*, the District Court ruled that "it would have been obvious to a reasonable officer that intentionally striking [the plaintiff] with his patrol truck to get him to stop would have been unreasonable under the Fourth Amendment." *Womack*, 2023 U.S. Dist. LEXIS 25958, at *17. In *Clark*, the District Court held that "unreasonably and unnecessarily striking plaintiff with [a] police vehicle, without warning, while plaintiff fled officers on foot without presenting any threat to those officers—is prohibited under the Fourth Amendment[]." *Clark,* 505 F. Supp. 2d at 897.

Plaintiff's case is essentially identical to *Womack* and *Clark*. Like those plaintiffs, Plaintiff was moving away from law enforcement, with his hands held in the air, when the Defendants chose to utilize deadly force. At that time, Plaintiff had no way to access the BB-gun. He was walking down a road, alone. The only person within any reasonable distance was in his house a considerable distance away. Plaintiff represented no threat to *anyone*, let alone a serious threat to officer safety. Accordingly, Plaintiff had a clearly established right to be free from the Defendants' use of unreasonable deadly force.

While the precedents cited above establish Plaintiff's right, other cases clarify its extent. For example, in *Est. of George v. City of Rifle*, deadly force was reasonable because the plaintiff 1) "reached behind his back and retrieved a handgun"; 2) "moved the handgun up to his chest area"; 3) "demonstrat[ed] the intent to shoot himself"; 4) "held the gun . . . with the muzzle pointing at his chest [with] his thumb on the trigger"; and, 5) ignored "approximately forty-six [commands] . . . to drop his handgun." *Est. of George v. City of Rifle*, 85 F.4th 1300, 1320 (10th Cir. 2023). Here, Plaintiff 1) never brandished or actually handled a firearm; 2) never pointed a firearm at himself or officers; and 3) was given only minimal commands and twenty seconds to comply

before the Defendants executed deadly force. Comparatively, Plaintiff never represented an actual threat, serious or otherwise.

Similarly, in *Arnold v. City of Olathe,* officers "engaged [the plaintiff] for an extended period without success." *Ibid.* Over nearly three hours, the plaintiff, 1) "actively ignored the officers' commands to surrender"; 2) "retreated to [an adjacent] room"; 3) "point[ed] a firearm at the officer"; 4) "refus[ed] to drop the firearm"; and 5) "verbally threaten[ed] the officers." 35 F.4th 778, 792 (10th Cir. 2022). Like *George*, the *Arnold* plaintiff actually handled and aimed a firearm. The plaintiff also made verbal threats to the officers while handling the firearm. None of those facts occurred in the Plaintiff's encounter with the Defendants. Compared to *George* and *Arnold*, here, the Plaintiff never actually handled a firearm nor brandished it at himself or officers. Plaintiff also gave no indications or manifestations of violence. Instead, he held his hands in the air and walked away. Accordingly, Plaintiff was not a threat and deadly force was clearly unreasonable.

### B.  Each *Graham* Factor Favors the Plaintiff

Each *Graham* factor favors holding the Defendants' use of deadly force unreasonable. *Graham*, 490 U.S. at 396. Whether force was reasonable is an objective inquiry. *Id.* at 397. To evaluate force, the court must pay "careful attention to the facts and circumstances of each particular case . . ." *Id.,* at 396. Here, the circumstances show that deadly force was clearly unreasonable.

The Court must not limit itself to a "mechanical application" of the inquiry. *Ibid.* (cleaned up). Rather the Court must consider all the "unique" facts of the Plaintiff's case, including that: 1) the Defendants surveilled the Plaintiff based on calls reporting concern, but no threating or otherwise criminal behavior; 2) Plaintiff's suspected firearm was physically inaccessible; 3) Plaintiff passed approximately seventy-two houses without incident before the Defendants used

deadly force; 4) Plaintiff held his hands in the air; and 5) Defendants used deadly force within twenty seconds of ordering Plaintiff to drop to the ground. Each of these factors supports a finding that Plaintiff did not constitute a serious, imminent, threat.

> **i. Because Plaintiff was suspected of a misdemeanor, the first *Graham* factor weighs in his favor.**

The first *Graham* factor, the severity of the crime, weighs in Plaintiff's favor. *Ibid.* As alleged, the Plaintiff's suspected criminal activities were misdemeanors. ECF 32, ¶ 62 (violation of a restraining order and impeding a highway*). Graham* "weigh[s] against the use of significant force if the crime at issue is a misdemeanor." *Lee v. Tucker*, 904 F.3d 1145, 1149 (10th Cir. 2018). Accordingly, the first factor favors Plaintiff.

Defendants assert that Plaintiff actually committed a felony. ECF 33, at 6. This assertion challenges the facts as alleged. On a motion to dismiss, it is the conduct as alleged that is evaluated. *Thompson*, 23 F.4th at 1256. Accordingly, the Court must consider the reasonableness of Defendants' use of deadly force against a misdemeanant. Under such circumstances, the first *Graham* factor clearly supports the Plaintiff.

Defendants' claim is also legally and factually incorrect. Defendants claim that the Plaintiff "possess[ed] a firearm." ECF 33, at 6. This is not true. Plaintiff possessed a BB-gun, and a BB-gun is not a firearm. *See* C.R.S. § 18-1-901(h) (defining "firearms"). The key feature of a firearm is that it is powered by "explosive charge." *Ibid.* This definition does not include BB-guns, pellet rifles, or other *air-powered* pneumatic devices. *See People v. Serna-Lopez*, 2023 COA 21, 531 P.3d 410, 419-20 (requiring the court to consider whether the definition of "deadly weapon," which specifically included "firearms," could apply to BB-guns).

Even considering the issue from the perspective of suspecting the Plaintiff of carrying a firearm, that suspicion alone does not entitle the Defendants to use deadly force. *Garner*, 471

U.S. at 11. First, at the time of the hit, Plaintiff was—*at worst*—suspected of fleeing. Under *Garner*, "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." *Ibid*. Second, the felony distinction is not as clear as the Defendants suggest. In most cases, a detailed inquiry into the distinction was not necessary. *See, e.g.*, *Vette v. Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021). Some relied on the relationship between the underlying crime and violence. *See, e.g.*, *Estate of Valverde v. Dodge,* 967 F.3d 1049, 1061 n.2 (10th Cir. 2020). The Tenth Circuit also recognizes that the relationship of violence to the suspected offense is significant for the reasonableness inquiry. *See Estate of Ronquillo v. City & Cnty. of Denver,* 720 F. App'x 434, 438 (10th Cir. 2017) (unpublished) ("Defendants do not contend that any of [plaintiff's] alleged crimes were accompanied by violence. We thus weigh this factor in favor of the estate.").

Considering this caselaw, suspecting the Plaintiff of a felony does not, automatically, render the first factor in Defendants favor. Rather, the Court should consider that the Defendants only suspected Plaintiff of possessing a firearm, not handling or otherwise menacing with it. As such, this factor does not strongly weigh towards the Plaintiff or Defendants. However, if the Court considers the factor based on the allegations, it should weigh in favor of the Plaintiff. Under either lens, Plaintiff's conduct did not constitute a threat sufficient to use deadly force.

> **ii.   Because the Plaintiff posed *no* threat, the second *Graham* factor weighs in his favor.**

Because Plaintiff posed no "immediate threat," *Graham*, 490 U.S. at 396, and "deadly force is justified only . . .[where] there was a threat of serious physical harm to himself or others," *Cordova,* 569 F.3d at 1192, and while the threat is imminent, *Reavis,* 967 F.3d at 989, the second *Graham* factor favors Plaintiff.

The seriousness of a threat depends on the totality of the circumstances, including specific factors. *Larsen*, 511 F.3d at 1260. The first factor considers "whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands." *Larsen*, 511 F.3d at 1260. As alleged Plaintiff did not initially respond to commands from an unknown party, nor was he legally required to do so. Once the Defendants identified themselves, Plaintiff held his hands in the air. Holding his hands in the air showed he was unarmed and not a threat. Plaintiff could not "drop his [BB-gun]" because he was not holding the BB-gun. *Ibid.* Instead, he took a few more steps and, within seconds, the Defendants ran him over. *Cf. Huff*, 996 F.3d at 1091. This is not a failure to comply as conceived of in *Larsen*. 511 F.3d at 1260.

The remaining *Larsen* factors support the Plaintiff. Defendants concede that Plaintiff made no "hostile motions." ECF 33, at 8; *see Larsen*, 511 F.3d, at 1260. Plaintiff's lack of hostile motions also informs his "manifest intentions." *Ibid.* Because Plaintiff never made any hostile motions, he manifested no intent to harm himself or others, meaning both factors favor the Plaintiff. Defendants try to sidestep this fact by asserting that Plaintiff "continued flight toward a populated area." ECF 33, at 8. Defendant omits that Plaintiff peacefully passed through and left a populated area while under the Defendants' surveillance. The "populated area" Defendants describe was actually a *single house* after Plaintiff already passed seventy-two other houses without incident. Plaintiff neither fled towards a populated area, nor evinced any other kind of hostile intention. Both factors favor Plaintiff.

Regarding the distance between Plaintiff and the Defendants, Plaintiff was on an empty road and the Defendants approached in two police vehicles. ECF 32, ¶ 78-91; *Larsen*, 511 F.3d, at 1260. Any proximity between the parties was due to the Defendant's decision to contact Plaintiff. ECF 32, ¶ 22. The fact that the Defendants remained in vehicles decreases any danger

they may have faced. Defendant asserts that because Plaintiff "was believed to be in possession of a long gun," the third factor should favor Defendant. ECF 33, at 8. Defendant omits that Plaintiff could not access the suspected gun, so it was not a threat. None of these facts supports the Defendant. Accordingly, each *Larsen* factor supports the Plaintiff.

Defendants belatedly argue that Plaintiff "might attempt suicide by cop." ECF 33, at 8. Defendants presents this claim as if they learned it contemporaneous to their use of force. It was not. It was actually given at an "indeterminate time" *before* the altercation. ECF 32, ¶ 59. The Defendants *did,* contemporaneously, obtain information from the source of the rumor that she had "no knowledge of [the Plaintiff's] journey or possible possession of a firearm;" however, her lack knowledge does not support a serious, imminent threat. *Id.* ¶ 23. Similarly, Defendants' suspicions were not the same as the actual facts. Nothing that actually occurred suggested Plaintiff intended to harm himself. Previous threats, even when actual and life-threatening, do not justify the use of deadly force. *Huff*, 996 F.3d at 1091. Any previous threat was extremely vague, and unsupported by the actual circumstances of the encounter. Accordingly, the Plaintiff clearly did not constitute a threat.

Tenth Circuit and District Court precedent clarify the difference between an actual threat and the Plaintiff's case. In *Arnold*, *Larsen,* and *George,* the plaintiffs made clear threats and actually handled firearm and aimed them at themselves, officers, or others. *Arnold*, 35 F.4th at 792; *Larsen*, 511 F.3d at 1260; *George*, 85 F.4th at 1306. Contrastingly, in *Clark*, running a car into a suspect who "fled on foot without presenting any threat" was unreasonable. *Clark*, 505 F. Supp. 2d at 897. In *Huff*, shooting a suspect who "had [his] hands up in the air," and moved "a few feet [forward]," was unreasonable. Plaintiff's circumstances are far more similar to *Clark* and *Huff* than to *George*, *Arnold*, or *Larsen*. Like *Clark* and *Huff*, Plaintiff did not constitute a threat.

### iii.    The third *Graham* factor favors the Plaintiff

The third *Graham* factor considers whether the Plaintiff "actively resist[ed] arrest or attempt[ed] to evade arrest by flight." *Graham*, 490 U.S. at 396. While Plaintiff did not immediately comply with the Defendants orders, he also did not "actively resist[]" or attempt to flee. *Ibid.* Instead, he held his hands in the air and walked a few more steps. *Cf. Huff,* 996 F.3d at 1091 (holding shooting a woman who "had her hands up in the air" and "ran a few feet into the field and turned [] toward the vehicle of [law enforcement]" violated clearly established law). Plaintiff's actions are not the same as brazenly resisting or fleeing, and walking away from police does not justify deadly force. *Ibid; Garner*, 471 U.S. 11

Courts do permit "some degree of physical coercion . . . when an individual refuses to obey an officers' lawful orders." *Andersen v. Delcore*, 79 F.4th 1153, 1165 (10th Cir. 2023) (internal citations and quotations omitted).  However, this case does not involve "*some*" force, it concerns *deadly* force. *Ibid.* (emphasis added). As alleged, the Defendants failed to use "any non-violent methods," and, in the span of twenty seconds, executed deadly force. ECF 32, ¶ 66. Law enforcement's general ability to employ *some* force has no bearing on whether the Defendants' use of deadly force was reasonable. It clearly was not.

### C. *Defendants Violated Plaintiff's Clearly Established Right to be Free from Unreasonable Force*

Consolidating the foregoing, Plaintiff possesses a clearly established right to be free from unreasonable force. *Garner* 417 U.S. 1; *Graham*, 490 U.S. 386; *Cordova*, 569 F.3d 1183; *Reavis*, 967 F.3d 978; *Huff*, 996 F.3d 1082. The Defendants clearly violated that right under a wealth of Tenth Circuit and Colorado District Court cases and analyses. *Larsen* 511 F.3d 1255; *George*, 85 F.4th 1300; *Arnold*, 35 F.4th 778; *Lee*, 904 F.3d 1145; *Clark,* 505 F. Supp. 2d 884; *Womack*,

2023 U.S. Dist. LEXIS 25958. Against this backdrop, Defendants' arguments that Plaintiff failed to plead a constitutional violation are illusory.

Defendants' final challenge claims that Defendants Luster, Montoya, Hammer, and McIntyre did not apply force to the Plaintiff. ECF 33, at 10. This is unpersuasive. Each of these Defendants participated in the use of unreasonable deadly force against the Plaintiff. Defendant McIntyre, specifically, was the highest-ranking officer involved. Everyone collectively agreed and participated in violating the Plaintiff's right to be free from unreasonable force. That only one officer could physically drive the car that struck the Plaintiff does not absolve the remaining Defendants of their liability for agreeing to and participating in the violation.

Defendant also helpfully cites *Bledsoe* for failure to intervene claims. *Beldsoe v. Carreno*, 53 F.4th 589, 616 (10th Cir. 2022). Defendant devotes almost no analysis to challenge Plaintiff's failure to intervene claims and instead relies upon the assertion that Plaintiff cannot state a constitutional right that the Defendants violated. As that is clearly not the case, Defendants' assertion is without merit. *Accord Garner* 417 U.S. 1.

### D.  Plaintiff states a valid Monell claim

Pursuant to *Twombly* and *Iqbal*, Plaintiff states a valid claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To state a *Monell* claim, Plaintiff must state "enough facts to state a claim to relief that is plausible on its face. *Twombly*, 550 U.S. at 570. A claim is plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. To establish municipal liability, a plaintiff must show "(1) that a municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004).

Plaintiff alleged municipal liability based on the Moffat County Sheriff's "widespread and deliberately indifferent customs, habits, practices, and/or policies of condoning and ratifying the excessive use of force [which] led to the [Defendants'] decision to use unreasonable and extreme force against the [Plaintiff]." ECF 32, ¶ 112. Accordingly, Plaintiff alleged that the Moffat County Sheriff was liable for the Plaintiff's constitutional injury because he failed to adequately hire, investigate, train, supervise, and discipline his agents to prevent constitutional abuses through excessive force. *Id.*, ¶ 144-65. Plaintiff pled sufficient factual allegations to allow the court to draw the reasonable inference that the Defendants are liable. Iqbal, 556 U.S. at 678.

First, Plaintiff alleged that the individual Defendants were members of the Special Response Team ("SRT"). ECF 32, ¶ 16. The SRT members were activated personally by Defendant McIntyre, the Undersheriff of Moffat County. *Ibid.* As the ranking officer and commander of the SRT, Defendant McIntyre was in command of the Defendants as they surveilled and contacted the Plaintiff.

Second, Plaintiff alleged that after he turned down the county road, the Defendants developed a plan to run the Plaintiff over with a police vehicle. *Id.*, ¶ 55-56. The officers, who included not only the Undersheriff, but also a Lieutenant, two sergeants, and one investigator, agreed to this plan. *Ibid.*; *see also id.*, ¶ 22(a) (providing the Defendants names and ranks). Several Defendants explicitly stated that they planned to run the Plaintiff over. *Id.*, ¶ 76. No Defendant contested or tried to intervene in the use of deadly force.

These factual allegations lead to several logical conclusions. First, the SRT was a pre-existing multi-jurisdictional task force with its own policies and procedures. Second, the SRT was led by Defendant McIntyre and staffed with other senior Sheriff's Office officers. Third, the

use of deadly force was discussed by the senior officers, agreed upon, and ratified by Defendant McIntyre, the second-highest ranking law enforcement individual in Moffat County.

From these conclusions, the following reasonable inferences may be drawn by the Court. The SRT operated pursuant to policies and procedures whether formal or informal. Those policies and procedures were known by the senior officers involved in the decision to utilize deadly force against the Plaintiff. The senior officers believed their decision to use deadly force under the circumstances as alleged complied with the SRT's policies and procedures, as well as those of their regular departments.

*Monell* liability does not require an explicit policy. Rather, municipal policy may "take the form of . . . [1] 'a formal regulation or policy statement' . . . [2] an informal custom . . . [3] 'the decisions of employees with final policymaking authority' . . . [4] the ratification by such final policymakers of the decisions . . . or [5] the 'failure to adequately train or supervise . . .'" *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010).

First, logically, the SRT must have governing policies. Those policies permitted the SRT to engage in the use of force. Second, if the SRT lacked such policies, the team members still believed they were acting with the force and ratification of their respective law enforcement departments when they chose to use deadly force against the Plaintiff. That belief derived from a policy or custom, whether formal or informal. Third, the SRT's decision was ratified by Undersheriff McIntyre. As the second-highest ranking law enforcement official in the county, and the officer directly in charge of the SRT members, Defendant McIntyre was both a final policymaker and an individual qualified to ratify the decisions of the SRT. Fourth, the officers' decision to violate the Plaintiff's rights strongly supports an inference of improper training or supervision because they would not have used unreasonable force without those failures.

While Plaintiff alleged sufficient facts to support municipal liability under each of these grounds, the most significant is the involvement in, supervision over, and ratification of the SRT's decisions by Defendant McIntyre. "Whether an individual is a final policymaker for purposes of § 1983 liability 'is a legal issue to be determined by the court based on state and local law.'" *Vogt v. City of Hays*, 844 F.3d 1235, 1251 (10th Cir. 2017) (quoting *Dill v. City of Edmond*, 155 F.3d 1193, 1210 (10th Cir. 1998) (internal quotations omitted)). Longstanding state and local law are clear that the acts of the undersheriff are attributable to the sheriff. *See* C.R.S. § 30-10-505 ("Any default or misfeasance in office of such undersheriff . . . shall be deemed to be a breach . . . on the sheriff's behalf"); *see also Barton v. Cont'l Oil Co.*, 5 Colo. App. 341, 345 (1894) ("the acts and doings of [the] undersheriff could only be regarded . . . as those of the sheriff, in so far as they were the official acts of the office.") Under Colorado law, the duties of the sheriff and undersheriff are intertwined. *Compare* C.R.S. § 30-10-505 (noting that when the sheriff's office is vacant, the undersheriff shall "execute the office of sheriff") *with* C.R.S. § 30-10-505 (noting that the undersheriff shall be appointed by the sheriff and "serve during the pleasure of the sheriff").

Here, Undersheriff McIntyre, participated in, led, and ratified the SRT's decisions. Moreover, Defendant McIntyre faced no known consequences or demotion for his involvement and control over these decisions. Undersheriff McIntyre's direct involvement and consent ratified the SRT's actions and decisions. Sheriff Hume's failure to intervene or take any action to the contrary further ratified these decisions. Based on the foregoing, and the logical inferences developed above, the Sheriff of Moffat County is liable for the Plaintiff's constitutional injury.

### E. *Plaintiff plausibly alleges a constitutional violation to C.R.S § 13-21-131 and Article II of the Colorado Constitution*

Because Plaintiff properly alleged unreasonable and excessive force in violation of his Fourth Amendment rights, and because the Fourth Amendment to the U.S. Constitution and Article II, Section 7 of the Colorado Constitution are functionally identical, Plaintiff plausibly alleged a constitutional violation pursuant to C.R.S. § 13-21-131.

## CONCLUSION

For the foregoing reasons, the Court should deny the Defendants' Motion to Dismiss.

Dated this September 30, 2024

*s/Conor O'Donnell*
Igor Raykin
Michael Nolt
Conor O'Donnell
Kishinevsky & Raykin, LLC
2851 S. Parker Rd., Ste. 600
Aurora, CO 80014
igor@coloradolawteam.com
michael@coloradolawteam.com
conor@coloradolawteam.com
***Counsel for Plaintiff***

### CERTIFICATE OF SERVICE

   I hereby certify that on this September 30, 2024 a true and correct copy of the foregoing **PLAINTIFF'S RESPONSE TO MOFFAT COUNTY DEFENDANT'S MOTION TO DISMISS** was electronically served to the following:

David Goddard
Bruno, Colin, Goddard & Lowe, P.C.
1120 Lincoln Street, Suite 1606
Denver, CO 80203
dgoddard@brunolawyers.com
*Counsel for Moffat County Defendants*

Johnathan Eddy
Eric Ziporin
SGR, LLC
3900 East Mexica Ave., Suite 700
Denver, CO 80210
jeddy@sgrllc.com
eziporin@sgrllc.com
*Counsel for City of Craig, Daulton Caudell, Tracey Mendoza*

              *s/Krystle Jennings*
              Krystle Jennings, Paralegal
              Kishinevsky & Raykin, LLC